Cory A. Santos, Sr., Esq.
Nevada State Bar No. 8247
Cory@santoslawoffices.com
Theresa M. Santos, Esq.
Nevada State Bar No. 9448
Tsantos@santoslaw.attys.pro
SANTOS LAW, PLLC.
241 Ridge St., Ste. 340
Reno, NV 89501
Office: (775) 420-5222; Fax: (702) 456-5130
*Designated Resident Nevada Counsel*
*for Plaintiff Kristina Kerlus*

Wolfgang Mueller, Esq.
Michigan Bar No. P43728
Wolf@wolfmuellerlaw.com
Mueller Law Firm
41850 W. 11 Mile Rd., Ste. 101
Novi, MI 48375
(248) 459-9653; Fax: (248) 347-6630
* *Pro Hac Vice* pending
*Attorney for Plaintiff Kristina Kerlus*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| KRISTINA KERLUS, individually, | Case No.: 2:24-cv-02352-NJK |
| Plaintiff, | **FIRST AMENDED** |
| vs. | **COMPLAINT** |
| DR. JENNIFER CORNEAL, in her individual capacity; A. SANTOS, in her individual capacity; CITY OF LAS VEGAS, a Municipal corporation; and COUNTY OF CLARK, a Municipal corporation; LAS VEGAS METROPOLITAN POLICE DEPARTMENT, jointly and severally, | **AND** **JURY DEMAND** |
| Defendants. | |

NOW COMES the Plaintiff, KRISTINA KERLUS, individually, by and through her attorneys, Cory A. Santos and Theresa M. Santos, and Mueller Law Firm, by Wolfgang Mueller, pending *pro hac vice* admission, and files her First Amended Complaint against the Defendants,

DR. JENNIFER CORNEAL (DR. CORNEAL"), in her individual capacity;  A. SANTOS ("SANTOS"), in her individual capacity; COUNTY OF CLARK ("CLARK COUNTY"), a municipal corporation, CITY OF LAS VEGAS ("LAS VEGAS"), a municipal corporation, in this civil action, and LAS VEGAS METROPOLITAN POLICE DEPARTMENT ("LVMPD") stating unto this Court as follows:

### JURISDICTION AND VENUE

1.  This is an action for damages brought pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth and Fourteenth Amendments to the United States Constitution, and Nevada state law against Defendants, Corneal, Santos, Clark County, and Las Vegas.

2.  Jurisdiction is founded upon 28 U.S.C. § 1331 and pendent jurisdiction over the state law claims.

3.  Forum is proper based on the situs of the incident, which occurred in the City of Las Vegas.

### PARTIES

4.  At all pertinent times Plaintiff, Kristina Kerlus, was a United States citizen and a resident of the State of Nevada.

5.  At all pertinent times, Defendant, Dr. Corneal, was employed as a pathologist by the Clark County Coroner's Office, a department of Clark County, and was acting within the scope of her employment and under color of law.

6.  At all pertinent times, Defendant, Santos, badge number 7200, was employed as a detective by the Las Vegas Metropolitan Police Department ("LVMPD"), a department of Defendant, Las Vegas, and was acting within the scope of her employment and under color of law.

7.  Santos, as a sworn police officer, had taken an oath, the Law Enforcement Code of Ethics, that stated, in pertinent part: *"As a sworn police officer, my fundamental duty is to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation and the peaceful against violence or disorder; and to respect the constitutional rights of all to liberty, equality and justice."*

2

8.    Defendant, Clark County, was, at all relevant times, a municipal corporation organized under the laws of the State of Nevada.

9.    Defendant, Las Vegas, was, at all relevant times, a municipal corporation organized under the laws of the State of Nevada.

10.    Defendant, Las Vegas Metropolitan Police Department, is a political subdivision of the Sate of Nevada and employed Defendants Corneal and Santos.  The LVMPD is liable for all state law torts committed by Corneal and Santos while they were employed by the LVMPD pursuant to the doctrine of respondeat superior.  The LVMPD is responsible for its own policies, practices, and customs.

**GENERAL ALLEGATIONS**

11.    On October 4, 2018, 12-week-old J.D. spent an uneventful day with his mother, Kristina Kerlus, and father, Jaevone Davis.

12.    That evening, Plaintiff breastfed J.D. and placed him next to her on their bed.

13.    The next morning, October 5, 2018, after preparing a bottle of formula for J.D., Plaintiff left for work at approximately 8:30 a.m.  J.D. was sleeping when she left for work.

14.    Approximately one hour later, Mr. Davis awoke and saw that J.D. was crying while laying on his stomach on the bed.  "He was real crabby for some reason."

15.    Mr. Davis attempted to feed J.D. with the bottle but was having difficulty feeding him. Normally a happy baby, Mr. Davis later told investigators that "[J.D.] don't feel like he's giving me the energy that he gives me."

16.    Mr. Davis took J.D. into the kitchen and began splashing water on J.D.  He then called Plaintiff and called 911 at 9:39 a.m.  The 911 operator instructed Mr. Davis to start chest compressions, which he did until paramedics arrived and transported the baby to Summerlin Hospital.  By this time, J.D. was in cardiac arrest.

17.    At Summerlin Hospital, doctors diagnosed a brain bleed.  A CT scan was run.  The scan revealed:

a.    No evidence of scalp swelling;

   b.    No skull fractures;

   c.    Fluid "consistent with" subdural hemorrhage;

   d.    Diffuse subarachnoid hemorrhage;

   e.    No definite bleeding within the brain substance;

   f.    Features concerning for brain swelling.

18.    Concerned that the baby exhibited signs of Shaken Baby Syndrome ("SBS"), the Summerlin doctors notified the LVMPD and Child Protective Services ("CPS").

19.    J.D. was transported to University Medical Center ("UMC") for further treatment.

20.    While at UMC, J.D.'s condition declined. He was placed on life support and tragically succumbed to his condition on October 7, 2018.

**Dr. Corneal's Autopsy**

21.    On October 8, 2018, Dr. Jennifer Corneal, a forensic pathologist for the Clark County Coroner's Office, was assigned to perform the autopsy on J.D.

22.    Dr. Corneal reviewed medical records from Summerlin Hospital and UMC.  She noted that there were "no outward signs of trauma to explain decedent being in medical distress."

23.    Dr. Corneal was already aware that doctors at Summerlin Hospital were concerned that the baby exhibited signs of SBS.

24.    Dr. Corneal was aware of a previous incident at a daycare on September 18, 2018, where Plaintiff noticed a cut and bruise on J.D.'s left leg, and that J.D. had been acting "cranky and eating less since the incident."

25.    Dr. Corneal's autopsy revealed "extensive subdural and subarachnoid hemorrhage with associated cerebral edema and herniation."  She also noted "subdural hemorrhage down the length of the spinal cord" and "hemorrhage of the posterior aspect of the eye and within the optic nerves."

26.    Dr. Corneal's autopsy noted "extensive retinal and sub-retinal hemorrhages, optic nerve sheath hemorrhage and optic nerve edema bilaterally, as well as focal early necrosis of the left optic nerve."

4

27.     Dr. Corneal also noted healing posterior left-sided rib fractures of the 9th and 10th ribs.

28.     Dr. Corneal, in a classic example of Confirmation Bias, quickly concluded that the "triad" of symptoms demonstrated evidence of "Shaken Baby Syndrome," or "Abusive Head Trauma."

29.     Dr. Corneal conducted microscopic analysis of J.D.'s organs but failed to document that there was clear and obvious evidence of widespread SCT in each organ.

30.     Dr. Corneal knew but consciously discarded the hypothesis that J.D.'s condition was the result of a rare, but known, complication of SCT.

31.     Dr. Corneal noted that J.D.'s heart was nearly double the normal heart size for an infant of his size/weight but failed to attribute any significance to the finding.

32.     Dr. Corneal was aware of J.D. having pulmonary hypertension and having been ill and vomiting in the weeks prior to October 5.  She did not seek to reconcile these finding with her diagnosis.

33.     Dr. Corneal observed that J.D. did not exhibit any evidence of diffuse axonal injury, including that caused by trauma, which would have been present had the baby been subjected to a whiplash-like shaking or abusive head trauma.

34.     Given the evidence in the autopsy, any reasonably well-trained pathologist acting in good faith would have concluded that J.D.'s death was the result of complications from SCT, which readily explained the anoxia-ischemic encephalopathy due to subarachnoid hemorrhages complicating the rupture of a thrombosed cerebral artery.  Instead, Dr. Corneal consciously ignored any evidence inconsistent with SBS and fabricated a cause of death as "blunt force head and neck trauma."  She classified the manner of death as "homicide."

35.     Dr. Corneal's fabricated conclusion provided probable cause that a crime occurred.

36.     No reasonably well-trained pathologist acting in good faith would have concluded that the evidence supported that a crime occurred.

37.     Dr. Corneal's conclusion was intentionally and deliberately false or made with

5

1  reckless disregard for the truth.  It was not the product of a mistake or oversight.

2       38.   Dr. Corneal's fabricated evidence and false statement on the autopsy report was

3  relied on by Santos and ultimately, the Clark County Prosecutor and Magistrate Judge who

4  approved an arrest warrant for Plaintiff on July 26, 2019.

5  **Santos' Police Investigation**

6       39.   On October 5, 2018, Defendant, Santos, interviewed Plaintiff and Mr. Davis to

7  obtain a timeline of events of the previous few days and information about J.D.'s health since birth.

8       40.   From the interviews with the parents, Santos learned that J.D., who was of mixed

9  race, had been diagnosed with Sickle Cell Trait ("SCT").  She also learned that J.D. had been born

10  premature and underweight.

11       41.   Santos learned that Mr. Davis had a positive history for SCT.

12       42.   Santos learned that the baby did not exhibit any signs of distress the day and evening

13  before he was taken to the hospital.

14       43.   Santos learned that the baby was sleeping when Plaintiff went to work at

15  approximately 8:30 a.m. on October 5, 2018, after preparing a bottle of formula.

16       44.   Santos learned that the baby began showing signs of distress in the morning after

17  Plaintiff left for work.

18       45.   Santos learned that the baby began showing signs of distress while in the care of Mr.

19  Davis and that he called 911 to summons help.

20       46.   Once armed with Dr. Corneal's fabricated evidence of a homicide, it was simply a

21  matter of Santos deciding which parent (or both) to charge.

22       47.   Despite all of the evidence showing that J.D. was not symptomatic of anything when

23  Plaintiff left for work, Santos deliberately wrote the following false statements in her report:

24           a.   "Per the timeline provided, Kristina was the primary caregiver of [J.D.]"

25           b.   "Kristina woke up the next morning leaving [J.D.] in the bed and pumped

26              versus waking up the child to feed.  [J.D.] was already symptomatic by this

27              time."

28

c.      "When Jaevone woke [J.D.] was already unresponsive."

d.      "It has been determined that the mother, Kristina Kerlus, was responsible for the injuries that led to the death of her child, [J.D.]"

48.    On July 26, 2019, almost ten months after J.C.'s death, and <u>despite no new evidence linking Plaintiff to the crime</u>, Santos submitted an arrest warrant for Plaintiff only, charging her with murder, NRS 200.010, 200.030.1, 200.508 – NOC 50005; and Child Abuse, Neglect or Endangerment Resulting in Substantial Bodily Harm, "to wit: by causing head and/or neck trauma to the said J.D., resulting in brain and/or spinal cord hemmorage [sic] by shaking the said J.D. or by manner and/means unknown."

49.    The Clark County prosecutor who recommended the murder warrant did not conduct an independent investigation of the case, instead relying on Defendants' representations to determine that probable cause existed for Plaintiff's arrest.

50.    On July 26, 2019, Plaintiff was arrested and charged with the murder of her infant son.  When Plaintiff asked why she was being arrested, Santos responded *"because I had to charge one of you."*

## POST-ARREST DEVELOPMENTS

51.    Plaintiff's criminal attorney, Ryan Helmick, sought the assistance of a forensic pathologist, Dr. Evan Matshes, to review the autopsy findings of Dr. Corneal. Dr. Matshes was able to demonstrate that the cause of death was complications from SCT, and not head and neck trauma as described by Dr. Corneal.  Dr. Matshes noted that "evaluation of the organs and tissues retained by the Clark County Coroner's Office demonstrated objective evidence of widespread sickling of red blood cells."

52.    Dr. Corneal's autopsy report did not mention sickling of any cells in microscopic examination of organs.

53.    Dr. Matshes concluded that the only reasonable classification for the death was "Natural."

7

54.     In 2023, The CCPO had Dr. Nathan Shaller of the CCCO re-examined the evidence, including the autopsy slides first reviewed by Dr. Corneal.

55.     Dr. Shaller's report concluded:

> Acute intracranial bleeding with intradural venous thrombosis, not definitively related to trauma, and unexplained thromboemboli.  Of note, spontaneous (atraumatic) intracranial thrombosis is a reported complication of sickle cell disease and other thrombophilic conditions. The role of sickle cell trait or disorders of clotting/hemolysis cannot be fully excluded. Also confounding is the reported history of two separate incidents of cardiopulmonary arrest with related hypoxic-ischemic injury; subsequent encephalopathy may cause the subdural hemorrhage and all intracranial findings in the absence of trauma …. As neither the role of an unsafe sleep environment nor the cause of the initial cardiopulmonary arrest can be definitively ascertained, the cause and manner of death are both classified as Undetermined.

56.     Based on Dr. Shaller's findings, coupled with those of Dr. Matshes, the Clark County Prosecutor's Office voluntarily dismissed criminal charges on or about December 19, 2022.

57.     The dismissal demonstrated that that but for Dr. Corneal's fabricated findings and false statements and material omissions in her autopsy report, probable cause that a crime occurred was lacking.

58.     Dismissal of the criminal charges constitutes a favorable termination of the criminal proceedings. *Thompson v. Clark*, 596 U.S. 36, 49; 142 S.Ct. 1332; 212 L.Ed.2d 382 (2022) (For favorable termination, "[a] plaintiff need only show that the criminal prosecution ended without a conviction.").

59.     From her arrest on July 26, 2019, to dismissal of criminal charges on December 19, 2022, Kristina Kerlus spent **1,243 days**, or **3 years, 4 months, and 24 days** illegally seized for crimes she did not commit.

60.     The individual Defendants, and the policies and customs of Las Vegas and Clark County as set forth herein, were a direct and proximate cause of Plaintiff's injuries and damages, including:

a.     Suffering a deprivation of liberty by being wrongfully seized, jailed, and restricted from freedom of movement for a period of over three years;

b.     Severe emotional distress for the period from her arrest to the present, including, but not limited to: the emotional distress of being charged with the murder of her baby and facing a sentence of life in prison without the possibility of parole; and faced with a criminal trial for crimes she did not commit;

c.     Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

d.     Fright, shock, indignity, humiliation, outrage, and embarrassment of being wrongfully charged of murder;

e.     Loss of custody of her other children;

f.     Loss of enjoyment of daily activities;

g.     Loss of employment opportunity, past income, and future earning capacity;

h.     Many of Plaintiff's injuries and damages are likely to be permanent;

i.     Other damages which may be revealed through discovery.

///
///
///
///
///
///
///

**COUNT I**
**14ᵗʰ AMENDMENT "FABRICATION**

9

**OF EVIDENCE" BY DEFENDANT DR. CORNEAL**

61.    Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

62.    At all times, Plaintiff had a clearly established constitutional right, secured by the Fourteenth Amendment, not to be subjected to criminal charges based on false evidence that was deliberately fabricated by the government.  *See Deveraux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) ("[T]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government.")

63.    Dr. Corneal deliberately and knowingly fabricated evidence to manufacture probable cause for an arrest warrant.  Her fabrication included reporting that J.D. died because of "blunt force head and neck trauma," and classifying the manner of death as "homicide."

64.    Dr. Corneal knew that the physical evidence from the autopsy could not rule out complications from SCT and knew that manner of death should have been listed as "Natural" or, at the very least, "Undetermined," neither of which would support criminal charges.

**COUNT II**
**4TH AMENDMENT MALICIOUS**
**PROSECUTION BY DEFENDANT DR. CORNEAL**

65.    Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

66.    At all times, Plaintiff had a clearly established constitutional right, secured by the 4th Amendment, not to be seized and deprived of liberty because of knowingly or recklessly made false statements or material omissions by a government official to manufacture probable cause. *See Franks v. Delaware*, 438 U.S. 154, 171-72, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) (It was clearly established that an individual has a right not to be seized based on false statements in

10

warrant requests that were intentionally made or made with reckless disregard for their truth and were necessary for a finding of probable cause).

67.     Defendant, Dr. Corneal, influenced or participated in the initiation of criminal prosecution and continued detention when she deliberately and knowingly fabricated evidence and made false statements and material omissions of facts, which were material to the finding of probable cause and Plaintiff's seizure and continued detention.

68.     But for Dr. Corneal's fabrication of evidence and deliberate false statements and material omissions in her autopsy report, probable cause *that a crime occurred* would have been lacking; such conduct constituting a claim of federal "malicious prosecution" under the 4th Amendment. *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002) ("[A] coroner's reckless or intentional falsification of an autopsy report that plays a material role in the false arrest and prosecution of an individual can support a claim under § 1983 and the Fourth Amendment.").

69.     Plaintiff's cause of action for federal malicious prosecution became complete when criminal charges were dismissed on December 19, 2022.  Dismissal of the criminal charges constitutes a favorable termination of the criminal case.

**COUNT III**
**4TH AMENDMENT MALICIOUS**
**PROSECUTION BY DEFENDANT SANTOS**

70.     Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

71.     At all times, Plaintiff had a clearly established constitutional right, secured by the 4th Amendment, not to be seized and deprived of liberty because of knowingly or recklessly made false statements or material omissions by a police officer to manufacture probable cause. *See Franks v. Delaware*, 438 U.S. 154, 171-72, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) (It was clearly established that an individual has a right not to be seized based on false statements in

11

warrant requests that were intentionally made or made with reckless disregard for their truth and were necessary for a finding of probable cause).

72.    Defendant, Santos, influenced or participated in the initiation of criminal prosecution and continued detention when she deliberately and knowingly made false statements and material omissions of facts which were material to the finding of probable cause and caused Plaintiff's seizure and continued detention.

73.    But for Santos' deliberate false statements and material omissions in her police report and warrant request, probable cause *that Plaintiff committed a crime* would have been lacking; such conduct constituting a claim of federal "malicious prosecution" under the 4th Amendment.

74.    Plaintiff's cause of action for federal malicious prosecution became complete when criminal charges were dismissed on December 19, 2022.  Dismissal of the criminal charges constitutes a favorable termination of the criminal case.

<u>**COUNT IV**</u>
<u>**"*MONELL*" LIABILITY OF CLARK COUNTY**</u>

75.    Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

76.    Upon information and belief, at all relevant times, Defendant, Clark County, did not have adequate procedures and policies in place, including any requirement that forensic autopsy reports be peer reviewed or subjected to any type of administrative review before being disclosed to law enforcement personnel.

77.    Upon information and belief, at all relevant times, no Clark County Coroner's Office employees, including Defendant, Dr. Corneal, received any training from Clark County, in their constitutional obligation to refrain from fabricating evidence to manufacture probable cause for an arrest.

12

78.    Up to and through the date of Plaintiff's conviction, no Clark County Coroner's Office employees, including Defendant Dr. Corneal, received any training from Clark County in their constitutional obligation to provide evidence to a prosecutor or magistrate judge that any reasonable person would know was evidence the magistrate judge would want to know.

79.    Obtaining, handling, and examining evidence in autopsies is a standard, everyday function of forensic coroners throughout the country.

80.    The creation and submission of investigative and autopsy reports is a standard, everyday function of forensic coroners throughout the country.

81.    On and before October 8, 2018, Clark County, by and through its final policymakers, had a custom and policy to authorize, condone, tolerate, and approve illegal and unconstitutional actions by Clark County Coroner's Office employees, including Dr. Corneal.

82.    Dr. Corneal's illegal and unconstitutional actions and practices, as more fully set forth above, included, but were not limited to:

a.    Fabricating evidence of abusive trauma to the infant to justify the finding of a homicide when she knew that the medical evidence showed the infant died of complications of Sickle Cell Trait (SCT);

b.    Knowingly and deliberately fabricating evidence to manufacture probable cause to arrest and/or strengthen a case for conviction;

c.    Knowingly and deliberately making false statements and/or recklessly omitting material facts in her autopsy report to manufacture probable cause for Plaintiff's arrest and continued detention; and

d.    Other acts and omissions that will be discovered through the discovery process.

83.    Defendant, Clark County, through its final policymakers, maintained a custom and policy of failing to adequately train, supervise, and/or discipline officers concerning proper and

13

constitutionally adequate evidence collection, analysis, and disclosure, including the duty not to fabricate evidence, and make candid and truthful disclosures to the prosecutor and judges in reports and/or testimony.

84.     Clark County's customs, practices, and policies, set forth above, demonstrated deliberate indifference to the constitutional rights of its citizens, including Kristina Kerlus, and were the moving force behind Dr. Corneal's constitutional violations.

85.     But for Dr. Corneal's conduct and the policies, practices, and customs of Clark County as set forth above, there would have been no probable cause for an arrest warrant and Plaintiff's deprivation of liberty.

### COUNT V
### *"MONELL"* LIABILITY OF LAS VEGAS

86.     Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

87.     Upon information and belief, at all relevant times, Defendant, Las Vegas, did not have adequate procedures and policies in place to prevent deliberate false statements and omissions of material facts from being presented in police reports by LVMPD detectives.

88.     Upon information and belief, at all relevant times, no LVMPD employees, including Defendant Santos, received any training from Las Vegas in their constitutional obligation to refrain from fabricating evidence or making false statements or omission of material facts to manufacture probable cause for an arrest.

89.     Writing reports and communicating with prosecutors and judges in criminal cases is a standard, everyday function of police detectives throughout the country.

90.     Making decisions as to whether evidence supports probable cause to seek an arrest warrant in criminal cases is a standard, everyday function of police detectives throughout the country.

14

91.     On and before October 8, 2018, Las Vegas, by and through its final policymakers, had a custom and policy to authorize, condone, tolerate, and approve illegal and unconstitutional actions by LVMPD employees, including Santos.

92.     Santos' illegal and unconstitutional actions and practices, as more fully set forth above, included, but were not limited to:

    a.    Arbitrarily deciding to seek the arrest of Plaintiff, despite all of the evidence suggesting that her infant son had not been in her presence for hours before exhibiting signs of distress;

    b.    Knowingly and deliberately making false statements and/or recklessly omitting material facts in her police report to manufacture probable cause for Plaintiff's arrest and continued detention; and

    c.    Other acts and omissions that will be discovered through the discovery process.

93.     Defendant, Las Vegas, through its final policymakers, maintained a custom and policy of failing to adequately train, supervise, and/or discipline officers concerning proper and constitutionally adequate evidence collection, analysis, and disclosure, including the duty not to fabricate evidence, and make candid and truthful disclosures to the prosecutor and judges in reports and/or testimony.

94.     Las Vegas's customs, practices, and policies, set forth above, demonstrated deliberate indifference to the constitutional rights of its citizens, including Kristina Kerlus, and were the moving force behind Santos' constitutional violations.

95.     But for Santos' conduct and the policies, practices, and customs of Las Vegas, as set forth above, there would have been no probable cause for an arrest warrant and Plaintiff's deprivation of liberty.

**COUNT VI**
**"*MONELL*" LIABILITY OF THE LAS VEGAS**
**METROPOLITAN POLICE DEPARTMENT ("LVMPD")**

96.     Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

97.     Upon information and belief, at all relevant times, Defendant, The Las Vegas Metropolitan Police Department ("LVMPD"), did not have adequate procedures and policies in place to prevent deliberate false statements and omissions of material facts from being presented in police reports by LVMPD detectives.

98.     Upon information and belief, at all relevant times, no LVMPD employees, including Defendant Santos, received any training from The Las Vegas Metropolitan Police Department in their constitutional obligation to refrain from fabricating evidence or making false statements or omission of material facts to manufacture probable cause for an arrest.

99.     Writing reports and communicating with prosecutors and judges in criminal cases is a standard, everyday function of police detectives throughout the country.

100.     Making decisions as to whether evidence supports probable cause to seek an arrest warrant in criminal cases is a standard, everyday function of police detectives throughout the country.

101.     On and before October 8, 2018, LVMPD, by and through its final policymakers, had a custom and policy to authorize, condone, tolerate, and approve illegal and unconstitutional actions by LVMPD employees, including Santos.

102.     Santos' illegal and unconstitutional actions and practices, as more fully set forth above, included, but were not limited to:

16

a.    Arbitrarily deciding to seek the arrest of Plaintiff, despite all of the evidence suggesting that her infant son had not been in her presence for hours before exhibiting signs of distress;

b.    Knowingly and deliberately making false statements and/or recklessly omitting material facts in her police report to manufacture probable cause for Plaintiff's arrest and continued detention; and

c.    Other acts and omissions that will be discovered through the discovery process.

103.    Defendant, LVMPD, through its final policymakers, maintained a custom and policy of failing to adequately train, supervise, and/or discipline officers concerning proper and constitutionally adequate evidence collection, analysis, and disclosure, including the duty not to fabricate evidence, and make candid and truthful disclosures to the prosecutor and judges in reports and/or testimony.

104.    LVMPD's customs, practices, and policies, set forth above, demonstrated deliberate indifference to the constitutional rights of its citizens, including Kristina Kerlus, and were the moving force behind Santos' constitutional violations.

105.    But for Santos' conduct and the policies, practices, and customs of LVMPD, as set forth above, there would have been no probable cause for an arrest warrant and Plaintiff's deprivation of liberty.

///

///

///

17

///

### COUNT VII
### STATE LAW MALICIOUS PROSECUTION BY
### DEFENDANTS DR. CORNEAL AND SANTOS

106.    Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

107.    The underlying criminal proceedings against Plaintiff terminated in her favor with the dismissal of the charges in state court on or about December 19, 2022.

108.    The criminal investigation and prosecution were undertaken without probable cause or good faith, and with malice.  NRS 199.310.  They were not undertaken with the intention of bringing Plaintiff to justice for having committed the alleged murder of her child.  Instead, the individual Defendants acted to frame Plaintiff for murder and child abuse by fabricating evidence of a crime relating to the natural death of her son.  Defendants' malice was evidenced in at least the following ways:

a.    By Dr. Corneal reporting that the baby's death was the result of "blunt force head and neck trauma," and classifying the death as a homicide, when any reasonably competent and trained forensic medical examiner would have realized that the death was caused by complications of SCT and would necessarily have to be classified as "Natural."

b.    By Santos falsely stating in her report that evidence suggested Plaintiff committed the acts that caused the baby's death, when the clear evidence was that she was at work when the baby began exhibiting signs of distress.

c.    By Santos falsely stating that Plaintiff was the primary caregiver of

18

the baby when he became "symptomatic" and that by the time J.D.'s father awoke, J.D. was "already unresponsive."

    d.    By Santos deciding to arbitrarily seek Plaintiff's arrest instead of the baby's father *"because [she] had to charge one of you."*

109.    As a direct and proximate result of Defendants' malicious prosecution, Plaintiff was charged with crimes she did not commit, causing her to suffer the special injuries and damages set forth above.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

1    ///

2    ///

3

4                              **PRAYER FOR DAMAGES**

5         WHEREFORE, Plaintiff, KRISTINA KERLUS, prays for damages, jointly and severally as

6    to all Defendants, including:

7

8              a.    Past and future compensatory damages, jointly and severally against
                     all Defendants in an amount to be determined by the jury;

9         .

10             c.    Punitive damages as against Defendant, Dr. Corneal;

11        .

              c.    Punitive damages as against Defendant, Santos;

12

              d.    Reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988;

13

14             e.    The costs and disbursements of this action pursuant to 42 U.S.C.
                     § 1920;

15

16             f.    All damages allowed under Nevada law; and,

17             g.    Such other and further relief as appears just and proper.

18        DATED this 19th day of December, 2024.

19                                        SANTOS LAW, PLLC

20
                                   By:    /s/ Theresa M. Santos
21                                        _____
                                          Nevada State Bar No. 8247
22                                        cory@santoslawoffices.com
                                          Theresa M. Santos, Esq.
23                                        Nevada State Bar No. 9448
                                          Tsantos@santoslaw.attys.pro
24                                        241 Ridge St., Suite 340
                                          Reno, NV 89501
25                                        Office: (775) 420-5222; Fax (702) 456-5130
                                          *Designated Resident Nevada Counsel for Plaintiff*
26

27                                        MUELLER LAW FIRM

28

                                          20

By:    s/Wolfgang Mueller
WOLFGANG MUELLER (P43728)
Attorney for Plaintiff
41850 W. 11 Mile Road, Ste. 101
Novi, MI 48375
(248) 459-9653 | (248) 347-6630 (fax)
wolf@wolfmuellerlaw.com
*Pro Hac Vice* pending
Attorney for Plaintiff Kristina Kerlus

## REQUEST FOR JURY TRIAL

Pursuant to Federal Rules of Civil Procedure 38(b) and 42 U.S.C. §1981a, Plaintiff demands a trial by jury in this action on all issues so triable.

DATED this 19th day of December, 2024.

SANTOS LAW, PLLC

/s/ Theresa M. Santos
By:    _____
Nevada State Bar No. 8247
cory@santoslawoffices.com
Theresa M. Santos, Esq.
Nevada State Bar No. 9448
Tsantos@santoslaw.attys.pro
241 Ridge St., Suite 340
Reno, NV 89501
Office: (775) 420-5222; Fax (702) 456-5130
*Designated Resident Nevada Counsel for Plaintiff*

MUELLER LAW FIRM

By:    s/Wolfgang Mueller
WOLFGANG MUELLER (P43728)
Attorney for Plaintiff
41850 W. 11 Mile Road, Ste. 101
Novi, MI 48375
(248) 459-9653 | (248) 347-6630 (fax)
wolf@wolfmuellerlaw.com
*Pro Hac Vice* pending
Attorney for Plaintiff Kristina Kerlus

21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28